No. 68,732

IN THE MATTER OF THE APPLICATION OF THE CITY OF GREAT BEND, KANSAS, FOR THE APPOINTMENT OF APPRAISERS TO APPRAISE AND ASSESS DAMAGES AND VALUES BY REASON OF CONDEMNATION BY SAID CITY OF AN INTEREST IN CERTAIN REAL PROPERTY HEREIN DESCRIBED FOR PUBLIC USE.

(869 P.2d 587)

Opinion filed March 4, 1994.

*Dennis M. Feeney,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Richard D. Greene,* of the same firm, was with him on the briefs for appellants.

*Robert G. Suelter,* of Hagen, Bates & Suelter, of Great Bend, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: David and Deanna Essmiller appeal from a jury verdict in this eminent domain proceeding. Their contentions on appeal center upon the admissibility of evidence. They contend that the trial court erred by allowing the City of Great Bend's expert appraiser to testify about the condemnation damages because the expert considered frequency and duration of flooding as a factor in reaching his opinion. They also contend that the court erred by allowing the expert to testify about condemnation damages based upon a cost approach rather than the market data

approach prescribed by the pretrial order. Finding no reversible error, we affirm.

On May 2, 1991, the City filed a petition for condemnation of land for a flood control project, including land owned by the Essmillers. The City sought to condemn in fee 7.51 acres and to secure a ponding easement on approximately 61.8 acres of Essmiller's 80-acre tract.

The court-appointed appraisers awarded the Essmillers $378,020 for condemnation of the 7.51 acres and for the taking of the ponding easement over the 61.8 acres. The appraisers also awarded $1,650 for crop damages; that award was not appealed to the district court and is not at issue in this appeal.

The Essmillers timely appealed to the district court. The jury returned a verdict of $298,000, resulting in a deficiency or over-payment by the City of $80,020. The Essmillers appeal.

## Nature of Interest Taken

The first question involves careful consideration of the nature of the interest taken by the City to secure a ponding easement on the 61.8 acres of the Essmiller property. The parties are in agreement with the law applicable to this case but are deeply divided on the question of whether the City was allowed to introduce evidence of a limited use of the ponding easement, thereby contradicting the description of the easement taken according to the petition and appraisers' report. Kansas law is clear that regardless of the future intention of the condemnor, the rights actually acquired, and not the intended use of those rights, is the measure of the landowner's compensation. *Roberts v. Upper Verdigris Watershed*, 193 Kan. 151, 158, 392 P.2d 914 (1964).

An eminent domain proceeding is a special statutory creature and is not a civil action governed by the Kansas Code of Civil Procedure. The eminent domain proceeding is administrative rather than judicial. K.S.A. 26-501 provides, in part, that proceedings in eminent domain shall be brought by filing a verified petition in the district court of the county in which the real estate is situated. That was done in this case.

K.S.A. 26-502 provides: "A petition shall include allegations of (1) the authority for and the purpose of the taking; [and] (2) a description of each lot, parcel, or tract of land and the nature of

the interest to be taken." K.S.A. 26-504 further provides that the court, upon finding that the plaintiff has the power of eminent domain and that the taking is necessary to the lawful corporate purposes of the plaintiff, shall enter an order appointing three disinterested householders of the county to view and appraise the value of the land and to determine the damages resulting from the taking.

The law requires the condemnor in the verified petition to describe the nature of the interest to be taken, and further requires the appraisers, after receiving written instructions from the court, to view and value the land taken and to assess damages resulting from the taking. Upon completion of their work, the appraisers shall file their report in the office of the clerk of the district court. K.S.A. 26-505; K.S.A. 26-506. The appraisers' report identifies the interest taken and the damages resulting from the taking. It is from this report that an appeal is taken by a dissatisfied party, plaintiff or defendant.

According to the statutory procedure, the plaintiff condemnor is first required to describe the nature of the interest to be taken in its petition. This act of describing the nature of the interest the condemnor is to take is very important. Indeed, in the case of *Hudson v. City of Shawnee*, 246 Kan. 395, Syl. ¶ 2, 790 P.2d 933 (1990), we said that "[t]he property rights taken by a condemnor are to be determined by the language in the petition for eminent domain and the appraisers' report. A condemnor bears the burden of drafting its petition to show the limitations in its taking."

In *Hudson*, the City of Shawnee's petition for condemnation described the easement in broad terms, incorporating the use of all three driveways to the property. Even though there was evidence that at least one of these driveways was always open to the landowner and the landowner's customers, the City was prohibited from introducing evidence that the condemnor's intended use was less than the fullest use permitted under the description of its easement. The language used by the City in its petition controlled. 246 Kan. at 401.

Of crucial importance is the description of the nature of the interest taken in the appraisers' report. In most cases, the interest set forth in the petition becomes the interest identified in the

appraisers' report. If the two are different, then both descriptions must be read together to determine the nature of the interest to be taken. Any ambiguity must be resolved in favor of the landowner and ultimately determined by the description contained in the appraisers' report. *Hudson*, 246 Kan. 395, Syl. ¶ 2; *Roberts*, 193 Kan. at 158-59; *Sutton v. Frazier*, 183 Kan. 33, 45, 325 P.2d 338 (1958).

In *Roberts*, 193 Kan. at 157-59, we said:

"The commissioners' report, and only their report, is evidence of the land appropriated, the extent of the easement and its use.

. . . .

"On appeal from the commissioners' award the only matter to be litigated is the amount of damages. The trier of facts is not concerned with evidence as to the intended extent of the use. The extent of the use is to be determined from the language in the commissioners' report as a matter of law."

In *Sutton*, 183 Kan. at 45, we said that "[t]he report of the appraisers must show what is taken, and what the landowners part with. Nothing is taken by implication or intendment. The landowners may rely implicitly on the [appraisers'] report filed. This [appraisers'] report becomes the evidence and the only evidence of the commissioners' doings."

The principle established in the above cases is that once the nature of the interest to be taken is identified in the appraisers' report, parol evidence will not be admitted for the purpose of establishing a lesser interest based on the condemnor's intended use. The rights acquired, not the intended use of those rights, are the basis for assessing landowners' damages. *Roberts*, 193 Kan. at 159.

The rationale for such a principle is apparent, for "[i]f the landowners are not compensated in full for the full use, as set out in the [appraisers'] report, the condemnor can take the full use in the future without further compensation to the landowners." *Roberts*, 193 Kan. at 158. In *Roberts*, the condemnor attempted to introduce evidence that it intended only infrequent use of the flooding easement. In responding to this attempt, we said:

"If the condemnor desires only an infrequent limited use of the easement condemned it need only make certain that the limited use is properly stated

in the petition and incorporated in the commissioners' report which is filed with the register of deeds and governs the extent of the easement and the extent of the use." 193 Kan. at 158-59.

## Admissibility of Expert Testimony

The landowners contend that the trial court erred by allowing Herman Oakes, one of the City's experts, to testify about the condemnation damages based upon his consideration of frequency and duration of flooding. According to their argument, both the City's petition and the appraisers' report describe a permanent ponding easement, and to allow City experts to testify to a lesser use based on anticipated rainfall is contrary to the holding in *Roberts*.

In order to properly focus this issue, a brief statement of facts is necessary. The City employed two experts to appraise the property on its behalf. During the first day of trial, the City called its engineer and attempted to introduce tables involving the frequency and duration of rainfall and flooding over the ponding easement to be taken. The court sustained the landowners' objection, ruling

"that the extent of the easement condemned was to obtain a permanent easement for the right to detain and store water on, across, and over the easement area . . . . [T]here is nothing in the text of the report of appraisers as a matter of law that serves as a restriction of this easement or diminishes it in any way based on the duration or frequency of ponding, [and] parol evidence is not admissible to vary the extent of the use that is stated in the Commissioners' report, of the appraisers report."

Both city appraisers had used the frequency and duration tables in appraising the ponding easement. The court recognized the problem created by its ruling when it asked the City whether it would have any witnesses to present based upon its ruling. The City indicated it would need at least 10 days' to 2 weeks' continuance so that another appraisal could be obtained without considering the tables. However, at the end of that day of trial, the City stated to the court that it would be ready to go the next day even though the court had granted the City only a one-day continuance.

Both appraisers apparently deleted any reference in their reports to the frequency and duration tables. Yet, the valuations remained basically the same. Initially, the court denied the land-

owners' motion to strike or prevent the City appraisers from testifying. In doing so, the court noted:

"They have apparently deleted their references to the frequency of flooding. Their reports are subject to cross-examination, and the case law is very clear that experts should be given or should be, that attorneys should be granted broad leeway and given when cross-examining experts. If their opinions are faulty, I'm sure that that can be disclosed in the process of cross-examination."

The landowners then sought from the court the following: "I would ask that the Court at least issue an order that that type of information [limited use based on flooding by reason of anticipated rainfall] cannot be brought out through redirect to rehabilitate these witnesses."

The court responded:

"I think I have previously stated that the case law is clear that frequency and duration of flooding cannot be used to ameliorate the damages and if you want a motion in limine to that effect I'll grant the motion in limine but you have to be advised that even though a motion in limine is granted, which it is, if you open the subject on cross-examination, then he is free to explore it on redirect. You can't open the subject and then bar him from exploring it."

At a later time during the trial before the appraisers had testified, and after the landowners had the opportunity to voir dire each witness and renew their motion to prevent the witnesses from testifying, the trial court excluded the testimony of City Appraiser Jack Headley regarding the value of the ponding easement. The court excluded his opinion on the basis of *Roberts* because it determined that Headley had based his opinion on the frequency and duration tables. In other words, the court determined that Headley would be testifying to a limited use of the ponding easement by the City when the easement set forth in the appraisers' report described a greater taking by the City.

The court did not exclude the testimony on the same subject from the City's other expert, Herman Oakes. Even though the frequency of rainfall was a factor considered in Oakes' opinion, his opinion was not based exclusively on the tables, as was Headley's. Yet, the landowners contend that Oakes merely deleted any mention of the tables in his revised report but did not change

his appraisal in any other respect. The landowners state in their brief:

"Oakes plainly and impermissibly relied on the frequency and duration data for both his use and valuation opinions, by his own admission, but appellants [landowners] could not point [this] out to the jury without violating the in limine order entered by the court and parading the excluded evidence in front of the jury. Appellants' unwillingness and failure to cross-examine Oakes with the frequency and duration data was not a trial strategy decision. Rather, it was a decision forced on appellants by the trial court's ruling that if the subject was covered on cross-examination the City could redirect examine on it as well. In other words, the trial court's error occurred before any opportunity for cross-examination of arose, and could not be cured by such cross-examination."

It is important to note that the landowners initially moved to prevent any evidence from being presented to the jury about frequency and duration tables. They sought through their motion in limine to exclude such evidence on redirect examination. Nothing prevented the landowners from cross-examining Oakes concerning the basis of his opinion. It is apparent that the landowners did not want the jury to hear anything about frequency and duration of flooding. As to Oakes' testimony, the court said, "[T]he only restriction I am placing upon Mr. Oakes' testimony is that he will not be allowed to testify to the effect of the frequency and duration of flooding on market value of the property after the taking." In light of the court's earlier rulings, the landowners were free to explore with the witness the basis of his opinion on cross-examination.

The landowners, in their brief, note:

"Consequently, the jury never even knew it was awarding damages based upon this limited use, even though it obviously did. To compound this error, the trial court's in limine order precluded the Essmillers from cross-examining Oakes on his improper reliance upon this limited use, because the trial court ruled the Essmillers could not cover the subject on cross-examination without 'opening the door' for the City to introduce evidence of frequency and duration on redirect examination. The Essmillers were obviously placed in a no-win, Catch-22 situation by the lower court's ruling."

The trial court correctly noted that wide latitude would be given counsel in cross-examining the opposing side's expert witnesses. In this case, Oakes' opinion of value was not subjected to cross-examination on the precise subject that the landowners

complain about on appeal, that is, that Oakes impermissibly based his calculation of damages upon the frequency and duration of rainfall and flooding as gleaned from the frequency and duration tables. The reason Oakes was not cross-examined on this subject, in the words of counsel for the landowners, was "because to do so would have simply paraded the misleading and prejudicial evidence before the jury." Counsel elected not to cross-examine on this subject. The court did not, by any of its rulings, prevent such cross-examination.

The landowners ask this court to conclude as a matter of law that the trial court erred by allowing Oakes' expert opinion testimony on the value of the ponding easement. The reason asserted by the landowners is that Oakes' opinion was based upon a lesser use than that specified in the appraisers' report. Thus, according to the landowners' argument, the jury valuation was based on evidence of a lesser use than the easement described in the appraisers' report because Oakes' opinion reflects a lesser use based on anticipated rainfall.

"The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion. The test on appellate review of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision." *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 8, 822 P.2d 591 (1991).

Applying this standard, we conclude that the trial court did not abuse its discretion. While Oakes admitted that he considered the frequency of rainfall as a factor, the record is clear that this was not the only or the most significant factor he considered. *Roberts* and related holdings do not deal with the admissibility of evidence in the form of expert opinions. They stand for the proposition that "[t]he trier of facts is not concerned with evidence as to the intended extent of the use. The extent of the use is to be determined from the language in the [appraiser's] report as a matter of law." 193 Kan. at 159. Oakes' opinion may have been based in part upon anticipated rainfall. This is not a basis for excluding his expert testimony. Only if his opinion was based exclusively upon anticipated rainfall as Headley's opinion was,

would the court be required by law to exclude the opinion testimony. We conclude that the trial court did not err in admitting the testimony of Oakes.

The landowners requested that the court give the following instruction:

"For purposes of determining compensation for the ponding easement acquired by the Condemnor, you are to determine the compensation due the landowners based upon the Condemnor making the full use of the rights acquired. Your determination of compensation is not to be based upon a use more limited than the full use which the Condemnor has acquired."

They contend that the court erred in not giving this instruction. However, the giving of this instruction was unnecessary and potentially misleading. The tables were excluded by the trial court. They jury heard no evidence on the frequency and duration of rainfall, nor did the jury hear any evidence concerning the tables. Even though Oakes admitted outside the presence of the jury in voir dire questioning by the landowners that frequency of rainfall was a factor he considered in arriving at his damage figure, we have no idea what impact this factor may have had upon the jury determination of damages. The evidence before the jury on the ponding easement did not include any evidence of a more limited use. The landowners elected not to cross-examine Oakes regarding his opinion but ask us to assume that his opinion was based on frequency of rainfall.

Oakes' opinion is severely criticized by the landowners in their brief and in argument before this court. The conclusions they would have this court reach is that Oakes based his opinion upon anticipated rainfall as gleaned from the frequency and duration tables. Yet, on the record before us Oakes denied basing his opinion on frequency and duration of flooding. Neither his partial reliance on frequency and duration of flooding, nor the fact that his appraisal did not change when he modified his report was presented to the jury. Counsel chose not to question the basis of Oakes' opinion as it relates to limited use "because to do so would have simply paraded the misleading and prejudicial evidence before the jury." Oakes told the trial court under oath during voir dire questioning that he did not base his opinion on frequency and duration of flooding, although it was a factor in formulating his opinion. Whether that testimony was truthful,

given the identical values in Oakes' initial and revised reports, was not a matter for the trial court to decide nor is it a matter for this court to decide. Credibility of witnesses is a matter for the factfinder to determine. In a jury trial, the jury is to determine the witnesses' credibility. On the record before, us we do not know what part rainfall data played in Oakes' opinion, and we may not assume that it was determinative, resulting in a verdict necessarily based on intended use rather than property taken.

In the absence of any evidence that the jury based its award of damages on a limited use instead of the actual nature of the easement described in the City's petition and the appraisers' report, we must affirm.

### Admissibility of Evidence Based on Cost Approach

The landowners contend that the court erred by allowing Oakes to base his opinion on a cost approach rather than the market data approach set forth in the pretrial order. The pretrial order provided that "[j]ust compensation is to be determined by the market data approach as provided by law."

We note first that Oakes stated at the outset of his testimony that his appraisal of the improvements was based on the cost less depreciation approach. The landowners did not object at that time. Oakes then testified at length and in detail on direct and cross-examination about his valuation of the improvements. The landowners did not object during that testimony. At the conclusion of his testimony, which covered more than 70 pages in the transcript, the City moved to admit Oakes' report into evidence. The landowners objected to the report because it was contrary to the pretrial order and at that time moved to strike all of his testimony.

With respect to the substantive issue, we recognize the importance of pretrial orders in the fair and orderly trial of cases. We believe, however, that the admission of the cost approach data in this case did not violate the pretrial order. Although Kansas law prefers the market data approach, it also recognizes that under some circumstances alternative approaches may be used. Such circumstances exist here. The pretrial order's reference to use of the market data approach "as provided by law"

permits alternative methods when appropriate under Kansas law. It thus permitted an alternative approach on the facts of this case.

The parties agree that Oakes used the market data approach to value the real estate interests but used a cost approach to value at least some of the improvements. Oakes used the cost approach to value all of the improvements that would remain on the property after the taking, added that to the value of buildings taken by the ponding easement, and then reached a total value of all improvements.

The value of all improvements that were to be left on the property was $233,700; the total value of buildings that were to be removed because of the ponding easement was $105,000. Oakes then added the value of the land to the value of the improvements for a total of $422,000 as the "before-taking" value of the property. For the "after-taking" value, he determined that the best use of the 59.49 acres remaining would be dry cropland, which he valued at $450 per acre, taking into consideration the impact of the ponding easement. To that total land value of $26,770, he added the value of the remaining improvements, for a total value of the property of $273,500 after the taking. According to Oakes, the Essmillers' damages amounted to $148,500 and were defined by the difference between the before value and the after value.

This court recently reiterated the three generally accepted methods of appraising real property:

" '(a) the market data approach which is based upon what comparable properties had sold for; (b) the depreciated replacement cost or cost approach which is based upon what it would cost to acquire the land and to build equivalent improvements less depreciation; and (c) the income approach or capitalization of income which is based upon what the property is producing or is capable of producing in income." *Board of Sedgwick County Comm'rs v. Kiser Living Trust,* 250 Kan. 84, 92, 825 P.2d 130 (1992).

In *Kiser,* this court held that the market data approach was

"the most common method of valuing real property and [that it] should be used when there have been sales of comparable properties in the same locale, near the time of the taking. When the property is so unique that there is no ascertainable market and there are no sales of reasonably similar or comparable property, the other methods—depreciated replacement cost approach or the income approach—may be used." 250 Kan. at 92.

Under Kansas law, the market approach is preferred, but other methods may be used if there are no "comparables" from which to develop the market data. The parties agree that Oakes used the cost approach because he considered the improvements to be unique or special and because it was difficult to find similarly improved farms to make direct sales comparisons. Oakes testified that it was hard to find other 80-acre tracts that were so highly improved. He chose the cost alternative because he believed it would be "more fair to the property owner" given the low additional value typically given improvements on over-improved farms. There is within the record a basis for admission of expert testimony based on the cost approach.

The Essmillers cite *In re Central Kansas Electric Coop., Inc.*, 224 Kan. 308, 582 P.2d 228 (1978), to support their contention that hog farming operations are not unique and that the market data valuation should have been required. In *Central Kansas Electric Coop.*, we rejected the notion that the use of property for hog farming amounted to a special or unique use that made it appropriate to use an alternative to the market value approach. 224 Kan. at 314. We held that '[t]he use of the property for swine production is no more unique than would be the production of cattle, poultry, sheep or some other operation which might involve the use of special buildings or location." 224 Kan. at 316.

Unlike the property in *Central Kansas Electric Coop.*, Essmillers' property was not only used as a hog farming operation but was also used as a farm residence and headquarters for a large grain farming operation, a custom grain and feed-mixing business, and a custom farm-spraying business. Oakes' testimony in this case established that he did not necessarily consider the hog farming operations on Essmillers' property unique. He did consider the Essmiller property to be overimproved and determined that the more fair way to address that overimprovement in his appraisal was to value the improvements separately on a cost basis. It was his opinion that if the property was sold on the open market, potential buyers would not pay the full value for all of the improvements. Under the above circumstances the record supports the trial court's ruling allowing Oakes to use the

cost approach to value the improvements. See *Kiser*, 250 Kan. at 92.

The Essmillers also contend on appeal that it was not appropriate to rely on the cost approach to value improvements in this case because the trial court did not rule in advance of trial that there were no comparables and that the property was indeed unique. They properly note that in *Kiser*, 250 Kan. at 88-89, and *Ellis v. City of Kansas City*, 225 Kan. 168, 172, 589 P.2d 552 (1979), the trial courts determined before trial that the property was unique and the proposed comparables could not be used, and that an alternative to the market data approach should be used to value the property. Neither case requires, however, that such a determination must be made before trial or be forever barred. The source of this purported requirement that any "uniqueness" determination be made before trial is *City of Shawnee v. Webb*, 236 Kan. 504, 694 P.2d 896 (1985). In Syl. ¶ 4 of *Webb*, this court held stated that "the trial court has broad discretion in determining *what* other sales of real estates are comparable. Such determination should be made prior to trial." (Emphasis added). Although *Webb* held that the determination of what sales are comparable should be made before trial, it did not require that it be determined *before trial* that there are no comparables. In *Webb*, the issue was whether the trial court erred in excluding three proposed comparables. The condemnor in *Webb* originally proposed 10 comparables and then added 2 more after the trial court determined that 3 were not comparable and could not be used. Although it might have been better for such determinations to be made here before trial, the trial court's failure to do so in this case is not reversible error provided its ultimate determination was proper.

Moreover, the reference to the market data approach in the pretrial order does not necessarily mandate its use throughout trial, particularly where, as here, circumstances warranted the cost approach. The trial court has broad discretion to modify a pretrial order to prevent manifest injustice. *Frevela v. McAloon*, 222 Kan. 295, 564 P.2d 508 (1977). We hold that the trial court did not err in allowing Oakes to testify about the value of the property. His reliance on the cost approach to value the improvements was not contrary to state law.

The admissibility of expert testimony is within the trial court's discretion. The test on appeal is whether any reasonable person would agree with the trial court. If any reasonable person would agree, this court will not disturb the trial court's decision. See *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 8, 822 P.2d 591 (1991). We conclude that the pretrial order's requirement that the market data approach be used "as provided by law" did not mandate use of the market data approach with respect to all valuations where, as here, circumstances warranted the cost approach in accordance with Kansas law. We hold that the trial court did not abuse its discretion in allowing Oakes to testify about the value of the property or in admitting Oakes' report into evidence. His reliance on the cost approach to value the improvement was consistent with state law and, thus, consistent with the pretrial order.

The landowners also argue that the trial court erred in refusing to give the following instruction: "In determining the amount of your award you may consider the value of the property to the owner for his special use or purpose, or for any purpose to which his property is reasonably adaptable. These special uses or purposes must be real, not speculative, conjectural, or remote."

The landowners requested this instruction after the trial court allowed Oakes to testify about values using the cost approach to value improvements, arguing that use of the cost approach was based on a determination that the property had a special use or purpose.

If the jury instructions, read as a whole, fairly instruct the jury on the law governing the case, are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal. *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991); *Leiker v. Gafford*, 245 Kan. 325, Syl. ¶ 1, 778 P.2d 823 (1989). Viewed as a whole, the instructions that the trial court gave properly and fairly instructed the jury on the law of the case.

Given our foregoing rulings in this case, the additional instructions that the landowners requested could have misled the jury, and the trial court did not err in refusing to give them. Viewing Oakes' testimony as a whole, he did not claim that he used the cost approach to value improvements because of any special use.

Rather, he used the cost approach because the market approach would result in an undervaluation of the improvements given the overimproved nature of the property. Instructing the jury on a special use could have been misleading.

The landowners' final contention is that the trial court erred in denying their motion for a new trial. "Our appellate review of the order denying a new trial is limited to whether the trial court abused its discretion." *State v. Anderson*, 211 Kan. 148, 150, 505 P.2d 691 (1973). The landowners claim that they did not have a reasonable opportunity to present their evidence because of the alleged errors of the trial court discussed above. Because we have resolved those issues against the landowners and concluded that the trial court did not err, we also conclude that the trial court did not abuse its discretion in denying the Essmillers' motion for new trial.

Affirmed.

ABBOTT, J., not participating.

PRAGER, C.J. Retired, assigned. ■